**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| Lancium LLC<br><br>                    Plaintiff,<br><br>          v.<br><br>Layer1 Technologies, Inc.<br><br>                    Defendant. | Civil Action No. 6:20-cv-00739-ADA<br><br><br>JURY TRIAL DEMANDED |

**DEFENDANT LAYER1 TECHNOLOGIES, INC.'S**
**MOTION TO DISMISS PURSUANT TO 35 U.S.C § 101**

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     BACKGROUND ....................................................................................................2

III.    LEGAL STANDARD .............................................................................................5

IV.     ARGUMENT ..........................................................................................................7

        A.      *Alice* Step 1:  The Independent Claims of the '433 Patent Are Directed to the
                Abstract Idea of Balancing Power Supply and Power Demand...............................7

        B.      *Alice* Step 2:  The Independent Claims of the '433 Patent Do Not Recite Any
                Inventive Concept. .............................................................................................12

        C.      The Remaining Claims of the '433 Patent are Likewise Patent Ineligible. ...........14

V.      CONCLUSION....................................................................................................16

# TABLE OF AUTHORITIES

CASES                                                                                                     PAGE(S)

*Affinity Labs of Tex., LLC v. DirecTV, LLC,*
   838 F.3d 1253 (Fed. Cir. 2016) .................................................................................7

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l,*
   573 U.S. 208 (2014) ....................................................................................... *passim*

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.,*
   788 F. 3d 1371 (Fed. Cir. 2015) ...............................................................................12

*Ass'n for Molecular Pathology v. Myriad Genetics, Inc.,*
   569 U.S. 576 (2013) ...................................................................................................6

*Bilski v. Kappos,*
   561 U.S. 593 (2010) .................................................................................7, 8, 10, 11

*Broadband iTV, Inc. v. DISH Network LLC,*
   No. 6:19-cv-00716-ADA (W.D. Tex. July 25, 2020) .................................................2

*BSG Tech LLC v. BuySeasons, Inc.,*
   899 F.3d 1281 (Fed. Cir. 2018) .................................................................................7

*BuySafe, Inc. v. Google, Inc.,*
   765 F.3d 1350 (Fed. Cir. 2014) ............................................................................7, 9

*ChargePoint, Inc. v. SemaConnect, Inc.,*
   920 F.3d 759 (Fed. Cir. 2019) ....................................................................... *passim*

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n,*
   776 F.3d 1343 (Fed. Cir. 2014) ...............................................................................14

*CyberSource Corp. v. Retail Decisions, Inc.,*
   654 F.3d 1366 (Fed. Cir. 2011) .........................................................................10, 11

*DDR Holdings, LLC v. Hotels.com, LP,*
   773 F.3d 1245 (Fed. Cir. 2014) ...............................................................................13

*Elec. Power Grp., LLC v. Alstom S.A.,*
   830 F.3d 1350 (Fed. Cir. 2016) .............................................................10, 11, 14, 15

*Enfish, LLC v. Microsoft Corp.,*
   822 F.3d 1327 (Fed. Cir. 2016) .................................................................................8

*In re Comiskey,*
   554 F.3d 967 (Fed. Cir. 2009) ...................................................................................6

*Intellectual Ventures I LLC v. Capital One Bank (USA),*
   792 F.3d 1363 (Fed. Cir. 2015) .........................................................................7, 11, 12

## TABLE OF AUTHORITIES
### (Continued)

CASES                                                                                              PAGE(S)

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    850 F.3d 1332 (Fed. Cir. 2017) ..........................................................................14

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
    850 F.3d 1315 (Fed. Cir. 2017) ..........................................................................15

*Internet Patents Corp. v. Active Network, Inc.*,
    790 F.3d 1343 (Fed. Cir. 2015) ............................................................................7

*Le Roy v. Tatham*,
    55 U.S. 156 (1853) ................................................................................................6

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012) ..................................................................................6, 12, 13

*OIP Technologies, Inc. v. Amazon.com, Inc.*,
    788 F.3d 1359 (Fed. Cir. 2015) ............................................................................8

*RecogniCorp, LLC v. Nintendo Co.*,
    855 F.3d 1322 (Fed. Cir. 2017) ..........................................................................13

*SAP America, Inc. v. InvestPic, LLC*,
    898 F. 3d 1161 (Fed. Cir. 2018) ...........................................................................9

*Synopsys, Inc. v. Mentor Graphics Corp.*,
    839 F. 3d 1138 (Fed. Cir. 2016) .........................................................................10

*Trading Techs. Int'l, Inc. v. IBG LLC*,
    921 F.3d 1084 (Fed. Cir. 2019) ............................................................................8

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) ........................................................................7, 11

STATUTES AND RULES

35 U.S.C. § 101 ........................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6) ...................................................................................1, 2

OTHER AUTHORITIES

84 Fed. Reg. 50 ....................................................................................................6

Defendant Layer1 Technologies, Inc. ("Layer1") hereby moves the Court for entry of an Order finding the claims of U.S. Patent No. 10,608,433 (the "'433 patent") invalid for failure to claim patent eligible subject matter under 35 U.S.C. § 101 and dismissing the infringement claims of Plaintiff Lancium LLC ("Lancium") against Layer1 under Federal Rule of Civil Procedure 12(b)(6).

## I.     INTRODUCTION

Lancium's '433 patent is directed to balancing power supply and power demand, a concept that the Federal Circuit has already found to be an abstract idea in *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759 (Fed. Cir. 2019).  The claims of the '433 patent center around a "power option agreement," which describes a contractual relationship entered into for the purposes of balancing loads on a power grid.  Courts have consistently held that contractual relationships formed to facilitate fundamental economic practices are abstract ideas.  Further, the claims simply describe a mental process because a human using pencil and paper can easily design a performance strategy in compliance with the power option agreement.

Moreover, the patent does not contain any inventive concept that transforms the abstract idea into a patent-eligible invention.  The patent simply takes the abstract idea of balancing power supply and power demand, and implements it on generic "computing systems" and "control system."   Those generic components perform well-understood, routine, and conventional activities, such as consumption of power by performing computing operations.  Such limitations cannot confer patent eligibility on otherwise ineligible claims.  The same is true for the added step of monitoring a set of conditions and determining a performance strategy accordingly, because collection and analysis of information is itself an abstract concept.

The '433 patent is thus invalid under 35 U.S.C. § 101.  Because the abstract idea of balancing power supply and power demand falls squarely within the Federal Circuit's precedent,

this is a "case[] where it is appropriate to resolve the Section 101 eligibility of the patent[]-in-suit as a Rule 12(b) motion to dismiss." *Broadband iTV, Inc. v. DISH Network LLC*, No. 6:19-cv-00716-ADA, Text Order (W.D. Tex. July 25, 2020) (Judge Albright).

## II.   BACKGROUND

The '433 patent is titled "Methods and Systems for Adjusting Power Consumption Based on a Fixed-Duration Power Option Agreement." It claims priority to a provisional application filed on October 28, 2019, and issued on March 31, 2020. Dkt. No. 1-1 ("'433 patent") at Cover. It contains 20 claims, three of which are independent. '433 patent at 59:1-62:38. Plaintiff Lancium alleged infringement of claims 1-3, 6-9, 11-20 ("Asserted Claims"). Dkt. No. 1 ("Complaint"). Consistent with the title of the '433 patent, the subject matter of the patent relates to determining how much electricity to consume depending on minimum consumption levels provided by a "power option agreement" as well as a set of conditions. '433 patent at Abstract.

The specification discloses that "[t]o maintain stability of the [electric power] grid, the grid operator strives to maintain a balance between the amount of power entering the grid from generation stations . . . and the amount of grid power used by the loads." *Id.* at 4:9-13. According to the specification, when the power consumption is low, reduction of power supply by the power generation stations ("curtailment") is not ideal, because it "results in available energy being wasted," among other problems. *Id.* at 4:13-25, 5:34-42. The '433 patent purports to solve this problem by designing a "power option agreement" to ensure minimum consumption levels. *Id.* at Title, Abstract, claim 1. One example of the minimum consumption levels ("minimum power thresholds") provided by the power option agreement is shown at the cover of the '433 patent (also Figure 12), in which the minimum levels are 5 MW, 10 MW, and 5 MW for hours 0-8, 8-16, and 16-24 in a day, respectively:



*Id.* at Cover, Fig. 12.

As explained by the specification, a power option agreement "provides the [power generation station] with the right, but not obligation, to reduce the amount of power delivered . . . to the load." *Id.* at 43:50-60.  To provide this option, "the load needs to be using at least the amount of power subject to the option (e.g., a minimum power threshold.)." *Id.*  For example, the load must be consuming at least 1 MW of power in order to provide the option to reduce power consumption by up to 1MW.  *Id.* at 43:60-65.  Exercise of the option, *i.e.*, reduction of power consumption by the load, can "balance loads" "when the power may be better redirected to other loads." *Id.* at 44:6-12.

The '433 patent further discloses that the power option agreement can be implemented in computer systems performing computer operations: "A computing system may receive power option data that is based on a power option agreement," and "determine a performance strategy for a load (e.g., set of computer systems) based on a combination of the power option data and one or more monitored conditions." *Id.* at Abstract.  The strategy may be "for assigning, transferring, and otherwise managing computational operations using the one or more datacenters." *Id.* at 47:47-51.  The stated goal of this strategy is to "enable efficient operation by the datacenters while also

ensuring that the datacenters operate at target power consumption levels" in compliance with the power option agreement. *Id.* at 47:51-56.

The specification describes an example system, depicted in Figure 11, that implements power consumption adjustment based on a power option agreement. A "remote master control system" 262 can control the amount of power delivered to "datacenters" 1102-1106 in accordance with the power option agreement. *Id.* at 43:36-50:21. The remote master control system further monitors and analyzes a set of "conditions," including "power availability 1120, power prices 1122, computing systems parameters 1124, cryptocurrency prices 1126, computational operation parameters 1128, and weather conditions 1129," in concert with the power option agreement to determine performance strategies for the datacenters. *Id.* at 45:7-10; 47:57-61.



FIGURE 11

*Id.* at Fig. 11.

The '433 patent claims methods, systems, and non-transitory computer-readable recording medium for carrying out this purported solution for balancing power supply and power demand based on a power option agreement. Claim 1 of the '433 patent for example recites:

1. A system comprising:

a set of computing systems, wherein the set of computing systems is configured to perform computational operations using power from a power grid;

a control system configured to:

>   monitor a set of conditions;

>   receive power option data based, at least in part, on a power option agreement, wherein the power option data specify: (i) a set of minimum power thresholds, and (ii) a set of time intervals, wherein each minimum power threshold in the set of minimum power thresholds is associated with a time interval in the set of time intervals;

>   responsive to receiving the power option data, determine a performance strategy for the set of computing systems based on a combination of at least a portion of the power option data and at least one condition in the set of conditions, wherein the performance strategy comprises a power consumption target for the set of computing systems for each time interval in the set of time intervals, wherein each power consumption target is equal to or greater than the minimum power threshold associated with each time interval; and

>   provide instructions to the set of computing systems to perform one or more computational operations based on the performance strategy.

'433 patent at claim 1. Claims 17 and 20 are method and computer readable medium claims having similar claim requirements. *Id.* at claims 17, 20. In short, the '433 patent claims determining how much electricity to consume depending on minimum consumption levels provided by a contract (*i.e.*, "power option agreement") as well as a set of conditions.

## III.   LEGAL STANDARD

"Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title." 35 U.S.C. § 101. As the Supreme Court has long recognized, however, "this provision contains an important implicit exception" for abstract ideas, laws of nature, and natural phenomena, which form the "basic tools of scientific and technological work." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014)

(quoting *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)) (internal quotations omitted).

The Supreme Court has adopted a two-step approach for determining patent eligibility under Section 101. *Alice*, 573 U.S. at 217-18. First, a court must ask "whether the claims at issue are directed to" a patent-ineligible concept, such as an abstract idea. *Id.* "[T]he unpatentable nature of abstract ideas has repeatedly been confirmed." *In re Comiskey*, 554 F.3d 967, 978 (Fed. Cir. 2009). The Supreme Court has explained that "[a] principle, in the abstract, is a fundamental truth; an original cause; a motive; these cannot be patented, as no one can claim in either of them an exclusive right." *Alice,* 573 U.S. at 218 (quoting *Le Roy v. Tatham*, 55 U.S. 156, 175 (1853)). Courts have found a wide range of claims directed to patent-ineligible abstract ideas, including methods of "organizing human activity" such as fundamental economic practices, and "mental processes" that can be performed by a human, either mentally or with pen and paper. *See, e.g.*, 2019 Revised Patent Subject Matter Eligibility Guidance, 84 Fed. Reg. 50-01, 52 (U.S.P.T.O. Jan. 7, 2019) (citing cases for groups of abstract ideas, including "[c]ertain methods of organizing human activity" and "[m]ental processes").

If the answer to the first step is yes, then the court must proceed to the second step and decide whether the claim elements, both individually and as an ordered combination, contain an "inventive concept" sufficient to "'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 72-73, 78 (2012)). To survive the second step, "[a] claim that recites an abstract idea must include 'additional features' to ensure that the [claim] is more than a drafting effort designed to monopolize the [abstract idea]." *Id.* at 221. "Simply appending conventional steps, specified at a high level of generality [is] not 'enough' to supply an 'inventive concept.'" *Id.* Thus, a claim

that recites the use of generic computer components to carry out an abstract idea is not patent eligible because it does no more than the abstract idea itself—it offers no "limitation beyond generally linking the use of the [purported invention] to a particular technological environment, that is, implementation via computers." *Id*. at 226.

## IV.   ARGUMENT

### A.   *Alice* Step 1:  The Independent Claims of the '433 Patent Are Directed to the Abstract Idea of Balancing Power Supply and Power Demand.

In determining whether patent claims are directed to an abstract idea, courts look to the "focus of the claims." *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1286 (Fed. Cir. 2018). The claims must be "considered in their entirety to ascertain whether their character as a whole is directed to excluded subject matter." *Internet Patents Corp. v. Active Network, Inc*., 790 F.3d 1343, 1346 (Fed. Cir. 2015).  At this stage of the analysis, the court should not focus on "excess verbiage" or implementation details, *Affinity Labs of Tex., LLC v. DirecTV, LLC*, 838 F.3d 1253, 1256 (Fed. Cir. 2016), but instead should focus on the "concept embodied by the majority of the limitations," *Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 715 (Fed. Cir. 2014).

The focus of the claims here, as the title of the '433 patent indicates, is adjusting power consumption based on a power option agreement, in order to balance power supply and power demand.  *See* '433 patent at Title, Abstract, claim 1.  The claims are thus directed to the abstract idea of balancing supply and demand—a type of "fundamental economic practice long prevalent in our system of commerce."  *Alice*, 573 U.S. at 219.  Since *Bilski* and *Alice*, the Supreme Court and the Federal Circuit have consistently held that such fundamental economic practices are abstract ideas.  *See, e.g.*, *Bilski v. Kappos*, 561 U.S. 593, 611 (2010) (risk hedging); *Alice*, 573 U.S. at 212 (intermediated settlement); *BuySafe, Inc. v. Google, Inc.*, 765 F.3d 1350, 1354-55 (Fed. Cir. 2014) (transaction performance guaranty); *Intellectual Ventures I LLC v. Capital One Bank (USA)*,

792 F.3d 1363, 1367 (Fed. Cir. 2015) (budgeting); *OIP Technologies, Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1362 (Fed. Cir. 2015) (offer-based price optimization); *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084 (Fed. Cir. 2019) (displaying bids and offers to assist a trader to make an order).

When deciding whether a claim is directed to an abstract idea, it is important to compare the asserted claims to claims that other courts have previously adjudicated. *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334-35 (Fed. Cir. 2016) ("[I]t is sufficient to compare claims at issue to those claims already found to be directed to an abstract idea in previous cases"); *Alice*, 573 U.S. at 221 (finding "no meaningful distinction" between the concept of "intermediated settlement" in *Alice* and the concept of "risk hedging" in *Bilski*). In *ChargePoint*, the Federal Circuit held that "demand response"—"[the] idea of reducing electricity consumption during periods of high demand"—is an abstract idea. *ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 763, 771 (Fed. Cir. 2019). The claims of the '131 patent at issue recited a network-controlled charging station that adjusted power transfer based on a demand response policy. *Id.* at 770-71. Claim 1 recited a control device to control charging of an electric vehicle, a transceiver to receive communications from a remote server relating to a demand response system, and a controller to modify the strategy for charging the electric vehicle based on the demand response communications. *Id.* at 770. The Federal Circuit found that demand response is "itself an abstract concept—a familiar business choice to alter terms of dealing to help *match supply and demand*." *Id.* at 771 (emphasis added).

The claims of the '433 patent are directed to the same abstract idea as the Federal Circuit found ineligible in *ChargePoint*. They recite the same concept of matching power supply and power demand. Specifically, claim 1 recites a system comprising "a set of computing systems"

using power from a power grid, and "a control system" determining a power consumption strategy for the computing systems based on power option data (*i.e.*, a set of minimum consumption levels) provided by a power option agreement, and a set of unspecified conditions. '433 patent, claim 1. These claim elements, taken as a whole, focus on controlling power consumption by the computing systems based on the power option data, just like controlling power consumption by the electric vehicle based on demand response data described by the claims in *ChargePoint*. The power option data here, just like the demand response data in *ChargePoint*, concern balancing power supply and power demand. *Compare* '433 patent at 44:10-12 (stating that the power option agreement helps to "balance loads coupled to the power grid") *with ChargePoint*, 920 F.3d at 771 (stating that demand response helps to "match supply and demand"). Therefore, like the claims in *ChargePoint*, the claims here are directed to the abstract idea of balancing power supply and power demand under the first step of *Alice*.

The fact that the policy for balancing supply and demand is provided by a contract ("power option agreement") does not make the claims any less abstract. The Federal Circuit has held that performing a routine task based on contractual obligations is an abstract idea. In *BuySafe*, the Federal Circuit invalidated claims that were "squarely about creating a contractual relationship— a transaction performance guaranty." *BuySafe*, 765 F.3d at 1355 (internal quotations omitted). Similarly, in *SAP v. InvestPic*, the Federal Circuit stated that "the creation and manipulation of legal obligations such as contracts involved in fundamental economic practices" is a category of abstract ideas involved in *Alice* and many of the Federal Circuit's cases. *SAP America, Inc. v. InvestPic, LLC*, 898 F. 3d 1161, 1168 (Fed. Cir. 2018). Accordingly, forming a contractual relationship for commercial transactions, such as the power option agreement here, is also an abstract idea.

Further, the claims here describe nothing more than a mental process of reviewing data provided by a power option agreement, and designing a performance strategy accordingly.  This could easily be performed by a human using pencil and paper, and is no more complex than what electric power grid operators have done for decades—"maintain grid stability and manage congestion" when necessary.  '433 patent at 4:13-16; *see, e.g.*, *Synopsys, Inc. v. Mentor Graphics Corp.*, 839 F. 3d 1138, 1139 (Fed. Cir. 2016) ("This idea of reviewing a description of certain functions and turning it into a representation of the logic component that performs those functions can be—and, indeed, was—performed mentally or by pencil and paper by one of ordinary skill in the art."); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016) ("[M]erely selecting information, by content or source, for collection, analysis, and display does nothing significant to differentiate a process from ordinary mental processes."); *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1371 (Fed. Cir. 2011) ("[M]ental processes are not patent-eligible subject matter because the application of only human intelligence to the solution of practical problems is no more than a claim to a fundamental principle.") (internal quotations omitted) (citing *Bilski*, 545 F.3d at 965).

For example, with the power option data shown in Figure 12 (excerpted below), one could easily design a performance strategy using pencil and paper, in which the computers consume at least 5 MW, 10 MW, and 5 MW of electricity for hours 0-8, 8-16, and 16-24, respectively.  Merely using a "control system" to achieve what a human can do is not patent eligible.



*Id.* at Cover, Fig. 12.

The claims here are not directed to a technological improvement.  Limiting the economic concept of balancing supply and demand to the technological field of electricity does not change the abstract nature of the claims.  "An abstract idea does not become nonabstract by limiting the invention to a particular field of use or technological environment."  *Capital One*, 792 F.3d at 1366; *see also Bilski*, 561 U.S. at 612 (claims on "how hedging can be used in . . . energy markets" not patent eligible); *Elec. Power Grp.*, 830 F.3d at 1354 ("[L]imiting the claims to the particular technological environment of power-grid monitoring is, without more, insufficient to transform them into patent-eligible applications of the abstract idea at their core.").  The claims do not, for example, claim an improved electrical grid that transfers power more efficiently or is cheaper to build.  Nor does the recited type of electrical loads, *i.e.*, "computing systems," add anything other than a field of use requirement.  The "computing systems" here are not meaningfully different from the electric vehicle consuming power in *ChargePoint*, 920 F.3d at 771, or even a set of light bulbs that could be turned on or turned off.   In sum, it is clear that the "innovative aspect of the claimed invention," to the extent there is any, "is an entrepreneurial rather than technological one."  *Ultramercial*, 772 F.3d at 722.

The claims are also directed to an abstract idea because Lancium is attempting to preempt the entire industry's use of power option agreements to balance power supply and power demand. Preemption is the policy concern that drives the judicial exceptions to patentability. *Alice*, 573 U.S. at 216. While complete preemption is not required to demonstrate patent ineligibility, preemption may sometimes "signal patent ineligible subject matter." *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F. 3d 1371, 1379 (Fed. Cir. 2015); *see also Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1369 (Fed. Cir. 2015) ("At step one of the *Alice* framework, it is often useful to determine the breadth of the claims in order to determine whether the claims extend to cover a 'fundamental . . . practice long prevalent in our system . . .'"). Here, the breadth of the claim language, which covers any type of "computing systems," any type of monitored "conditions," and any type of "performance strategy," forecloses the application of power option agreements—an abstract concept—in a broad industry sector. *See ChargePoint*, 920 F.3d at 769 ("Even a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims, thus preempting all use of that law or idea.").

Therefore, the claims here are directed to the abstract idea of balancing power supply and power demand.

## B. *Alice* Step 2: The Independent Claims of the '433 Patent Do Not Recite Any Inventive Concept.

If a claim is directed to an abstract idea, as the claims of the '433 patent are here, the court must then "determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application." *Alice*, 573 U.S. at 221 (quoting *Mayo*, 566 U.S. at 72, 80). Elements that do not "transform" an abstract idea and are not "inventive" include those that are "well-understood, routine, conventional," and those implemented on a

"generic" computer.  *Id.* at 221, 225 ("'Simply appending conventional steps, specified at a high level of generality,' . . . is not 'enough' to supply the 'inventive concept' . . . . [T]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention.") (quoting *Mayo*, 566 U.S. at 82, 77, 72); *BuySafe*, 765 F.3d at 1355 (invocation of generic computer functionality "adds no inventive concept").

Claim 1 fails to recite any inventive concept because it only cites conventional components such as "computing systems" and "control system."  "[A]fter *Alice*, there can remain no doubt: recitation of generic computer limitations does not make an otherwise ineligible claim patent eligible."  *DDR Holdings, LLC v. Hotels.com, LP*, 773 F.3d 1245, 1256 (Fed. Cir. 2014).  The specification states that the computing systems can be "various types of computing systems" as long as they "perform computational operations."  '433 patent at 33:19-21.  They include generic components such as "CPUs," "GPUs" and/or "ASIC's."  *Id.* at 33:26-29.  As discussed in Step 1 above, the computer systems are simply loads that consume electricity, and they are not meaningfully different from the electric vehicle in *ChargePoint*, 920 F.3d at 771, or even a set of light bulbs that could be turned on or turned off.  This is especially true because the claim is devoid of any detail regarding the specific operations performed by the computing systems.

The claim requirement of "monitor[ing] a set of conditions" and taking these conditions into account when determining the performance strategy also do not constitute an inventive concept, because it is itself an abstract idea of collecting and analyzing information.  *See RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) ("Adding one abstract idea . . . to another abstract idea . . . does not render the claim non-abstract.").  In *Electric Power Group*, the Federal Circuit held that a claim on monitoring a set of conditions in a power grid and deriving a "indicator of reliability" was patent ineligible "gathering and analyzing information."

*Elec. Power Grp.*, 830 F.3d at 1351-54.  Here, similarly, monitoring a set of unspecified conditions and deriving a performance strategy is patent-ineligible collection and analysis of information. *See also Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014) (holding that "collecting data," "recognizing certain data within the collected data set," and "storing [the] recognized data in [] memory" is an abstract idea); *Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1341 (Fed. Cir. 2017) (holding that "organizing, displaying, and manipulating data of particular documents" is an abstract idea). Notably, the claims do not provide any inventive *way* (or any specific way at all) to monitor such conditions.  *See Elec. Power Grp.*, 830 F.3d at 1356 ("[R]ather than claim some specific way of enabling a computer to monitor data from multiple sources across an electric power grid, some particular implementation, [the claims] purport to monopolize every potential solution to the problem—any way of effectively monitoring multiple sources on a power grid") (internal quotations omitted).  Therefore, the monitoring claim requirement here is "so result-focused, so functional, as to effectively cover any solution to an identified problem," *id.*, and cannot constitute an inventive concept.

### C.    The Remaining Claims of the '433 Patent are Likewise Patent Ineligible.

This Court need not consider every claim of the '433 patent before concluding that all are directed to ineligible subject matter under Section 101.  *Content Extraction*, 776 F.3d at 1348 (finding that district court "correctly determined that addressing each claim of the asserted patents was unnecessary.").  All Asserted Claims of the '433 patent are directed to the same abstract idea of balancing power supply and power demand, and do not recite any inventive concept.

Dependent claims 2, 3, and 16 provide some specificity as to the types of monitored conditions (price of power, parameters of computational operations, and price for cryptocurrency), and recite that the performance strategy is based on these monitored conditions.  But these claims

still recite patent ineligible collection and analysis of information even if the types of information are specified.  *See Elec. Power Grp.*, 830 F.3d at 1351-54 (holding that a claim was patent ineligible even though it recited the collection of certain information in a power grid, such as "transmission maps," "power plant locations," "frequency instability," "voltages," etc.).

Dependent claims 6-8 and 19 recite receiving "subsequent power option data" with decreased minimum power thresholds, and modifying the performance strategy accordingly.  Thus, these claims only add limitations parallel to those in independent claims 1 and 17, and are similarly patent ineligible.

Dependent claim 9 recites that the control system is a remote control system.  The mere concept of remote control is patent ineligible.  *See ChargePoint*, 920 F.3d at 766 (holding that "communicating requests to a remote server and receiving communications from that server" is an abstract idea); *Intellectual Ventures I LLC v. Erie Indem. Co.*, 850 F.3d 1315, 1330 (Fed. Cir. 2017) ("Remotely accessing and retrieving user specified information is an age-old practice that existed well before the advent of computers and the Internet.").

Dependent claim 11 recites simultaneous monitoring of the power option data and the set of conditions.  To the extent the simultaneous monitoring is facilitated by computer routines, this is the quintessential use of a "generic computer" to implement conventional human activities, and thus cannot be patent eligible.  *See Alice*, 573 U.S. at 223.

Dependent claim 12 recites that the power option agreement is requested from a qualified scheduling entity (QSE).  It essentially specifies a party to the contract, and thus cannot be patent eligible.

Dependent claims 13-15 provide that there can be two power consumptions targets for two time intervals, and the total duration of the time intervals is twenty-four hours.  However

complicated the power option data may be, the claims are still directed to an abstract idea that can be performed as a mental process using pencil and paper.

Finally, dependent claim 18 recites that the computing systems can operate at an increased frequency based on the performance strategy. The '433 patent, however, does not purport to have invented how the computing systems operate, and adjusting the frequency of a computing system was routine and conventional. *See* '433 patent at 13:4-17 (stating that "[v]arious types of computing systems can provide granular power ramping," including the ability of "adjusting the processing frequency").

Accordingly, nothing in any of the Asserted Claims converts the abstract idea of balancing power supply and power demand into an innovative concept to make them patent eligible under Section 101.

## V.     CONCLUSION

For the foregoing reasons, Layer1 requests the Court enter an Order finding the '433 patent invalid for failing to claim patent-eligible subject matter under 35 U.S.C. § 101, and dismiss this action in its entirety with prejudice.

Respectfully, submitted,

*/s/ Michael J. Sacksteder*
Michael J. Sacksteder, CA Bar No. 191605
(Admitted W.D. Tex.)
Email: msacksteder@fenwick.com

**FENWICK & WEST LLP**
555 California Street
San Francisco, CA  94104
Telephone:     415.875.2300
Facsimile:     415.281.1350

*Counsel for Defendant*
October 16, 2020                LAYER1 TECHNOLOGIES, INC.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was filed electronically in compliance with Local Rule CV-5(a).  All other counsel of record not deemed to have consented to electronic service were served with a true and correct copy of the foregoing by first class mail.

_/s/ Michael J. Sacksteder_
Michael J. Sacksteder
